Harrison E. LUNSFORD, Jr., Plaintiff,

v.

Honorable Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare of the United States of America, Defendant.

Civ. A. No. 4318.

United States District Court
W. D. South Carolina,
Spartanburg Division.

Sept. 6, 1964.

684

Hyatt & Creal, Simpson Hyatt, Spartanburg, S. C., for plaintiff.

John C. Williams, U. S. Atty., Robert O. DuPre, Asst. U. S. Atty., Greenville, S. C., for defendant.

WYCHE, District Judge.

This is an action asking the District Court to review a final decision of the Secretary of Health, Education and Welfare, in accordance with 205(g) of the Social Security Act (42 U.S.C.A. § 405 (g)). The decision of the Secretary denied the plaintiff the period of disability and disability insurance benefits for which he applied.

The plaintiff met the special earnings requirements during the effective period of the application, and continued to meet such requirements through March, 1963. On the basis of his application filed on March 16, 1961, the evidence must establish that the plaintiff was under a disability, as defined in the Act beginning on or before June 1, 1961, for entitlement to disability insurance benefits, and on or before June 16, 1961, for establishment of a period of disability.

The question before this Court is whether or not the record reveals substantial evidence to sustain the decision of the Secretary.

"Substantial evidence" means enough to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. Dowling v. Ribicoff, 200 F.Supp. 543 (D.C., 1961); Woolridge v. Celebrezze, 214 F.Supp. 686 (D.C., 1963).

The courts are not to try the case *de novo*. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize "the record as a whole" to determine whether the conclusions reached are rational. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folsom, 257 F.2d 778 (3d Cir., 1958). If they are, they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F.Supp. 153 (W.D.Ark., 1963); Corn v. Flemming, 184 F.Supp. 490 (S.D.Fla., 1960). In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision "with or without remanding the cause for a rehearing". 42 U.S.C.A. § 405(g). Thomas v. Celebrezze, 331 F.2d 541 (4th Cir., 1964), (decided April 15, 1964).

The plaintiff has been examined by numerous doctors. The record consists of reports of doctors dating back to 1955.

Although some of the doctors who examined plaintiff did not make a specific finding of disability on the part of plaintiff to engage in any substantial gainful activity, a summary of all of the medical evidence can lead only to the conclusion that plaintiff is unable to engage in any substantial gainful activity by reason of medically determinable physical and mental impairments which can be expected to result in death or to be of long-continued and indefinite duration.

Dr. Wrenn, a neurosurgeon, in a report dated March 13, 1956, to a former employer of the plaintiff and its insurance carrier, in connection with plaintiff's Workmen's Compensation claim, says, "This patient appears to be having continuing difficulty and, as has been previously pointed out the possibility of a developing arachnoiditis cannot be ignored. * * * I still feel that the studies suggested in my note of November 7 are in order in an attempt to further delineate this problem." His note of November 7 is, "I now feel that we should seek more objective data before closing this case entirely. Accordingly, I would recommend that he be re-admitted to the hospital and that his myelogram be repeated and that, in addition, a differential spinal anesthetic be carried out in an attempt to determine more about the quantity and quality of his pain. Certainly if there is good evidence for a ruptured disc, then I feel that we would have no choice other than to re-explore him."

A Medical Report of Dr. Leslie C. Meyer, a specialist in orthopedic surgery, dated January 16, 1957, shows a diagnosis of postoperative laminectomy, L–4 on the right, degeneration of the 4th interspace, residual low back and leg pain; he says that the claimant should show some gradual improvement in the years to come, that this is indefinite, however. Under "Remarks", Dr. Meyer says "This patient has, I believe, reached maximum improvement and no further medical treatment is indicated. His convalescence, however, will be quite slow. *I do not think that he will ever have a normal spine.* It was the neurosurgeon's opinion

that this patient might have an arachnoiditis although this could not be proven at any time during his diagnostic studies." (Italics added)

Dr. Hastings, a surgeon, in a report dated March 14, 1957, shows a diagnosis of generalized rheumatoid arthritis—following multiple low back operations and says that he has advised the patient not to work and that "This man is 100% disabled at present time & has been unable to work."

The foregoing medical evidence was submitted by the plaintiff with his original claim in 1956.

In a report dated March 23, 1961, Dr. Charles B. Hanna, a surgeon, says "In 1956 this man had a laminectomy & fusion of his lumbar spine. In Jan. 1961 he was seen for strain and sprain of his neck muscles (left). He has partial atrophy of his left arm & shoulder."

Dr. Frank R. Wrenn in a "Neurosurgical Follow-Up Note" on April 24, 1961, states "I obtained his records from Durham. He was seen there on February 6, 1961. A review of his story indicates he had a Volkmann's contracture in 1943 treated by a sympathectomy, which resulted in a Horner's syndrome. This was done on the left side. On examination today the patient showed a slightly smaller left pupil. I was not impressed with any ptosis. There was some mild atrophy of the left upper extremity, including the small muscles of the hand, and it was difficult to assess his functional strength. He exhibited an apparent decrease in sensation involving the entire left upper extremity, including the anterior and posterior shoulder and neck. * * *"

Dr. John N. Miller, Jr., full-time specialist in internal medicine, in a report dated June 14, 1961, makes the following diagnoses: 1. Acute strain, muscles left upper neck & shoulder, left. 2. Acute low back strain. 3. Degenerated cervical discs, ruptured C6 and C7. 4. Spinal fusion, lumbar region. 5. Osteoarthritis and osteoporosis, spine. He says that after treatment the plaintiff showed "no improvement" and that the optimum im-. provement that can be expected, if any, is "none". He further states that "This patient has been a victim of numerous 'compensation' injuries, dating back to the early 1940s. He is totally disabled, I feel both psychologically and physically."

Dr. Keith, an orthopedic surgeon, who examined the plaintiff on November 17, 1961, at the request and at the expense of the Government, said "X-rays of the cervical spine show some early arthritic spurring of the bodies of C4 and C7 with some narrowing of the interspaces of C5 and C6, although the arthritic changes are not marked. IMPRESSION: 1. Postoperative fusion of the lumbar spine from information obtained from the patient. 2. Mild to moderate degree of arthritis of the cervical spine with possibility of some root irritation to rule out old degenerative disc at this level. Limitation of motion noted in the examination."

Dr. Brownell, a psychiatrist, who also examined the plaintiff at Government request and expense, in a report dated January 19, 1962, says that the plaintiff was seen by him on January 17, 1962, and that "The man appears to be in considerable pain and shows marked limitation of motion as he enters and leaves the office. His head seems fixed, and more or less turned to the left. His left arm is held in a fixed position against his chest and movement for him appears to be quite painful. * * * I can make no diagnosis of a psychiatric illness other than the real anxiety which accompanies his limitations in movement and his inability to provide for himself and his family."

In a letter to the Social Security Administration dated April 25, 1962, Dr. Miller writes: "Mr. Lunsford recently asked me to complete another medical report for you, however, I have nothing new to add since my original report to you on June 15, 1961. * * * it is still my feeling that Mr. Lunsford is still totally disabled, both physically and psychologically, due to all of his previous injuries, operations, and his degenera-

tive condition of the spine. I have seen Mr. Lunsford frequently over a long period of time, * * *. Recently Mr. Lunsford was again hospitalized at the Spartanburg General Hospital for about three weeks for treatment of an embolus in the left ulnar artery."

Plaintiff's osteoporosis, degenerative osteoarthritis of the spine and ruptured discs and other impairments are certainly medically determinable and can be expected to be of long-continued duration and cannot in the foreseeable future, be so diminished as no longer to prevent substantial activity.

Plaintiff says that he has pain and stiffness in his back and that he is growing worse; his left arm is numb and he cannot use it; he cannot close his hand—that it hurts from his hand on up to his neck; he cannot use his right leg, that it is worse at times, it feels like it goes to sleep; he cannot climb and get around like he used to; he cannot concentrate on account of the pain; cannot sleep at night; he goes regularly to a doctor; takes medicine for pain every three or four hours; cannot drive an automobile on account of his nerves; that he might be able to walk four or five hundred feet without too much discomfort; that he has trouble dressing himself and at times cannot get down to tie his shoes; he spends the larger part of the day in the bed and the other time he spends sitting around the house and watching television.

Plaintiff was born June 15, 1915. He finished the eighth grade in school. He started to work on the farm when he was ten years old and worked on the farm until he was eighteen years old; he then went into the CC Camp for six months. He got married and went back to farming for about three years. He then worked for the Fruit Growers' Express Company for about four to five months. He then worked for Beaumont Manufacturing Company for about four years after he got married as a beamer and worked there for about a year. He had an accident on the job—got rolled up in the beamer and broke his arm in three places.

He stayed in the hospital for about five and one-half months after the accident. After his arm healed he went back to Beaumont and stayed possibly six months. He then went to work for Fiske-Carter Construction Company, doing carpenter work and worked there regularly for more than ten years. In 1954, he ruptured a disc. In 1956, after he recovered from three back operations, his former employer Fiske-Carter refused to rehire him. He then went to work for Roberson's Construction Company and worked for them for about two and one-half to three years as foreman of bridge work. However, he had trouble with his back while he was on this job. His employment with Roberson's was terminated when the job was completed. The latter part of 1960, he went to work for Christman and Parsons as a carpenter and worked there for about six or seven months until he was knocked off of a scaffold and strained the muscles in his neck and shoulder on December 31, 1960.

It is interesting to note in a report of contact made on March 16, 1961, by a representative of the Social Security office under the heading "Observations" it is stated, " * * * His left hand was about one-half the size of his right hand. Arm was extremely thin. He picked it up with his right hand to show me how it was 'shrinking' up. He 'squirmed' around in his chair during the interview and said he couldn't sit still long enough to talk to anyone. When the interview was over he put his right hand on the desk, pushed himself up and said 'I sat too long, my back sure is hurting'. I noted that he limped out, putting his weight just on the toes of his right foot in walking." And, on June 5, 1961, in a report of contact by the same representative, it was stated: " * * * He held his left arm somewhat 'crooked' against his side and walked with a limp of the right leg. His body was bent toward the right as he walked. I asked him if he could raise his left arm and he swayed to the right while sitting before me and tried raising the left arm. He was not able to raise it but

about 3 inches away from his side. *I do not think the man was 'putting on'. * * * The applicant was in extremely bad shape,* his left arm and shoulder appeared to be paralyzed. *He walked slowly—could not move the left arm and he appeared to be in considerable pain.* This was quite obvious—the receptionist brought his file back and said 'Mr. Lunsford is in pitiful shape.'" (Italics added)

■ As stated in 20 C.F.R., Sec. 404.-1511(a), where there are impairments involving the musculoskeletal system, the medical factor of severe pain may be taken into consideration in order to determine the extent of the impairment. The fact that there is such a subjective symptom as pain does not mean that it ranks as a lesser type of disability. In the case of Lewis v. Flemming, 176 F.Supp. 872 (E.D.Ark.1959) Judge Henley on page 876 stated: "There is nothing in the statute or the legislative history which indicates a Congressional intent to exclude disability caused by pain, as contrasted to other types of disability, such as disability resulting from loss of limbs or sight or from mechanical disfunction of the limbs, joints, or other organs of the body. As a matter of fact, common experience and observation teach that in many cases of disability pain in one form or another is the chief and immediate disabling agent. An individual's body may be mechanically capable of use and function, but the pain resulting therefrom may be so great as to preclude them. Indeed, the nervous system in an effort to avoid agonizing pain may in effect impose immobility and inactivity upon the person affected; and in such a case the disability is no less real than it would be if the patient had lost the mechanical use of his body." See, also, Blanscet v. Ribicoff, 201 F.Supp. 257 (W.D.Ark., 1962).

■ Plaintiff's personal physician, who has treated him over a long period of time, says that plaintiff is disabled. The expert opinions of physicians as to disability are not binding on the Examiner, but an expert opinion to that effect which is not seriously controverted by substantial evidence to the contrary supplies this court with a proper ground, inter alia, for reversal. Teeter v. Flemming, 270 F.2d 871, 77 A.L.R.2d 636 (7 Cir., 1959); Pope v. Celebrezze, 209 F. Supp. 392 (D.C.1962). In addition to expressing an opinion as to claimant's disability, his personal physician noted that no improvement in his condition can be expected.

Plaintiff has tried to get work since his last injury on the last job but without success. He also went to the Division of Vocational Rehabilitation and they told him that he was not in any shape for them to give him any help. He has tried to do things on his own but when he does he gets in so much pain he has to quit.

■ The phrases "inability to perform any substantial gainful activity" and "total disability" are not synonymous. In the case of Aaron v. Fleming, D.C.Ala., 168 F.Supp. 291, Judge Rives, Judge of the Fifth Circuit, sitting in the District Court, said: "It is further apparent that the referee gave too strict an application to 'disability.' Even though the Act is worded in strong language and the Congressional history indicates a strict policy of application, to conclude in this case that the plaintiff is not 'disabled' within the meaning of the Act would make 'disability' commensurate with 'helplessness', 'bed-ridden,' or 'at death's door'. No matter how infirm, or disabled, or sick a man is, if he still possesses some of his faculties and some degree of mobility, he is not in the strictest sense unable to perform 'any substantial gainful activity.' I do not interpret the Act to apply only to the totally helpless and bed-ridden nor to those at death's door."

■ In the case of Hall v. Flemming, 6 Cir., 1961, 289 F.2d 290, 291, the rule of construction is stated as follows: "However, in the determination of this appeal, the controlling questions are: (1) what can applicant do; and (2) what employment opportunities are there for a man who can do only what appellant can do?" See also, Kerner v. Flemming, 2 Cir., 283 F.2d 916, 921.

■ Where the statute refers to "any substantial gainful activity" the word "any" must be read in light of what is reasonable and not what is merely conceivable. Klimaszewski v. Flemming, 176 F.Supp. 927, 931–32 (E.D.Pa., 1959).

■ As was said by Chief Judge Sobeloff in Thomas v. Celebrezze, supra, "It is the duty of the Secretary to protect the public funds from malingerers; but where, as here, the possibilities of obtaining employment are practically nil, it is no answer that the claimant may be theoretically capable of performing some one of the 'non-physical, observational' jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation. Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think that they would hire anyone with the impairments of this claimant."

■ After a careful examination of the record in this case and the foregoing authorities, I am of the opinion that the final decision of the Secretary is not supported by substantial evidence and is clearly erroneous. On the contrary, the conclusion that plaintiff is unable to engage in any substantial gainful activity appears self-evident to me. Plaintiff in this case is the victim of medically determinable impairments of serious and substantial proportions which can only be expected to be of long and indefinite duration. As a direct result of these impairments plaintiff has been unable since December 31, 1960, to follow his employment in manual labor jobs. Plaintiff's physical impairments, when considered in connection with his individual circumstances of age, work experience, education, training and skill, serve to eliminate effectively, any reasonable possibility of suitable employment or employment for which plaintiff is qualified.

Under the foregoing authorities, I must conclude that the findings of the Hearing Examiner as to the establish-

ment of a period of disability and disability insurance benefits are not supported by substantial evidence on the record considered as a whole and under the authority for appeal given by 42 U.S. C.A. § 405(g) the conclusion of the Secretary that the plaintiff was not entitled to the period of disability and the disability insurance benefits was clearly erroneous, was incorrect, and must, therefore, be reversed.

It is, therefore, ordered, that the decision of the Secretary in this case be and the same is hereby reversed, with direction that judgment be entered for the plaintiff.